## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Joshua Raymond Armendariz,<br><br>Plaintiff,<br><br>vs.<br><br>Chris Rovney, Blue Earth County Attorney, in his official and individual capacities,<br><br>Defendant. | Case No. 20-cv-00464 (PJS/HB)<br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Defendant Chris Rovney's Motion for Summary Judgment [ECF No. 86].  For the reasons that follow, the Court recommends that the motion be granted on the ground that Rovney is entitled to qualified immunity.

## I.    BACKGROUND

Plaintiff Joshua Raymond Armendariz, representing himself, filed suit on February 6, 2020, against Defendant Chris Rovney, in both his individual and official capacities, under 42 U.S.C. § 1983.  (Compl. [ECF No. 1].)  The allegations in the Complaint arise out of a criminal prosecution against Armendariz in Blue Earth County, Minnesota, in which Rovney was the prosecutor.  The Complaint alleged several claims relating to the conduct of the criminal case, but all except one of the claims were dismissed on screening pursuant to 28 U.S.C. § 1915A(a).  (*See* May 18, 2020 Ord. Adopt. R&R [ECF No. 21]; Apr. 4, 2020 R&R [ECF No. 10].)  In particular, the Court

dismissed the official capacity claim against Rovney under *Monell* for failure to allege a policy or custom. (*See* Apr. 4, 2020 R&R at 5.) The surviving claim, against Rovney in his individual capacity, alleges that Rovney unlawfully deprived Armendariz of $15,705—money seized incident to Armendariz's arrest—without due process. (Compl. at 9–10.)

### A.    The Search Incident to Arrest and the Seizure of Cash from Armendariz

The events leading to the criminal prosecution that gave rise to Armendariz's Complaint took place on June 28, 2015. (Def.'s Ex. A at 1 [ECF No. 89-1 at 1]; Pl.'s Ex. 4 [ECF No. 103-1 at 14].) That day, according to the later-filed criminal complaint,[1] a Blue Earth County Sheriff's Deputy was informed that the Mankato (Minnesota) Department of Public Safety was looking for a black 2004 Dodge Stratus with a specific license plate. (Def.'s Ex. A at 2.) The driver of the car was believed to be Joshua Armendariz, who was suspected of having violated a Domestic Abuse No Contact Order (DANCO) and reportedly "did not have permission" from the owner of the vehicle to be driving it. (*Id.*) While on patrol, the officer saw the vehicle and, close by, Armendariz. (*Id.*) The officer promptly handcuffed Armendariz and told him he was under arrest for the DANCO violation. (*Id.*) He searched Armendariz incident to arrest and discovered a

---

[1] Rovney relies on the facts laid out in the criminal complaint to support his narrative of events and says the facts in the complaint are "undisputed." (Def.'s Mem. Supp. Summ. J. at 2 [ECF No. 88].) Armendariz does not challenge that representation or offer evidence to the contrary and, in fact, also submits a copy of the criminal complaint as part of his refutation of Rovney's motion. [ECF No. 103-1 at 14.] Accordingly, the Court relies on the criminal complaint for much of this factual background.

"thick stack of money" in Armendariz's pocket.  (*Id.*)  Armendariz told the officer the

money amounted to about $18,000[2] and was "from a trust fund and this was all the

money he had."  (*Id.*)  The officer noted that the bills were "mostly $100 bills; however,

there were also $20 bills in the stack as well."  (*Id.*)  In total, including the money found

in Armendariz's wallet and in the rubber band-bound stack, officers seized $19,636.

(Pl.'s Ex. 2 [ECF No. 103-1 at 4].)

      The officer put Armendariz in the back of his squad car.  (Def.'s Ex. A at 2.)  He

then asked an officer in the Mankato Department of Public Safety to contact C.A., the

owner of the Stratus, to ask for permission to search it.  (*Id.*)  Meanwhile, a second

officer arrived on the scene.  (*Id.*)  C.A. gave her consent for the officers to search the

car.  (*Id.*)

      Inside the trunk was a pink and white canvas bag that contained various

identifiable items, such as a purple camera and checks with other people's names on

them.  (*Id.*)  The officers also discovered a bank bag in the trunk printed with the words

"Vetter Sales & Service" (hereafter the "Vetter bag"), which contained several checks

made out to the business of the same name.  (*Id.* at 2–3.)  The records of the vehicle

search indicate that checks, but no cash, were inside the Vetter bag at the time it was

found by police.  (*See* Pl.'s Ex. 6 [ECF No. 103-1 at 20]; Def.'s Ex. A at 3; Def.'s Ex. D

at 2 [ECF No. 89-1 at 12].)

---

[2] The evidence receipt shows that there was $18,220 in the "stack" of money in
Armendariz's pocket, which was bound by a rubber band.  The officers also found
another $1,100 in cash in three envelopes and $316 in Armendariz's wallet.  (Pl.'s Ex. 2
[ECF No. 103-1 at 4].)

After further investigation, the officers learned that many of the items in the trunk of the Stratus matched the descriptions of items that had been reported stolen out of vehicles in North Mankato the previous night.  (Def.'s Ex. A at 2.)

C.A. later arrived on the scene to collect her car.  (*Id.* at 3.)  She told police that Armendariz had had her car for about three days and was supposed to have returned it.  (*Id.*)  She also reported that she had recently had lunch with Armendariz and at the time he "only had $6.00 on him," so she concluded "there was no way Armendariz should have as much money as [was] discovered in the vehicle."  (*Id.*)

Sometime later, Armendariz gave a statement to officers that he believed the pink and white canvas bag was left in the car by another individual, L.S.  (*Id.*)  He also told officers that the money found in his pocket was money he had been saving for his kids and that he had planned to have an attorney set up an account in their names.  (*Id.*)

The Vetter bag that was found in the Stratus's trunk matched the description of a bag that Gerald Vetter had reported stolen.  (*Id.* at 3.)  According to the police report filed by Vetter, the bag contained proceeds from Vetter's business and was stolen from the center console of his truck between 3:00 a.m. and 10:00 a.m. that morning.  (Def.'s Ex. D at 2.)  Vetter initially estimated the bag contained $5,000 or more in cash and three or four checks made out to Vetter.  (*Id.*)  He told the investigating officer that the majority of cash in the bag was in $100 bills.  (*Id.*)  When officers showed Vetter a picture of the Vetter bag found in the Stratus, Vetter confirmed it was his.  (*Id.*)

The next day Vetter called the investigating officer to report that, after reviewing his records, he believed the exact amount of money in the bank bag had been $15,705.

4

(Def.'s Ex. E at 1 [ECF No. 89-1 at 13].)  He reiterated that the money would have been primarily in $100 bills.  (*Id.*)  Vetter did not have the serial numbers for any of the bills, but he provided the officer with receipts of several cash transactions.  (*Id.*)  Months later, in an interview with Armendariz's public defender's investigator, Vetter said it was not uncommon for his business to have $5,000 in cash at one time.  He conceded it was rare to have $15,000 in cash, but stated that in the past he had deposited as much as $30,000 in cash.  (Def.'s Ex. B at 2 [ECF No. 89-1 at 6]; Pl.'s Ex. 1 at 2 [ECF No. 103-1 at 2].)  Seemingly at odds with his previous statements, however, Vetter told the investigator that he is often paid in small denomination bills, saying "I get a lot of ones, tens and twenties."  (Def.'s Ex. B at 3.)

On June 30, 2015, Armendariz was charged with receiving stolen property, a felony, under Minnesota Statute § 609.53.1.  (Def.'s Ex. A at 1.)

**B.    The Release of the Money to Vetter Sales & Service**

On July 7, 2015, Peggy Tagatz, a Property and Evidence Specialist at the Mankato Department of Public Safety, released the Vetter bag and $15,705 from evidence for return to Vetter Sales & Service.[3]  (Def.'s Ex. C at 1 [ECF No. 89-1 at 9]; Def.'s Ex. O at 1 [ECF No. 111-1].)  Prior to releasing the money, law enforcement photographed the money, and Vetter provided some proof of ownership over the $15,705

---

[3] The evidentiary record does not describe the process by which Tagatz was authorized to release the money, but Rovney's memorandum in support of this motion states that Tagatz released the money pursuant to Rovney's authority.  (*See* Def.'s Mem. Supp. Summ. J. at 4 ("[T]he $15,705 in cash was 'photographed and released' to Vetter under Rovney's direction.").)

in the form of sales receipts and signed a declaration of ownership under penalty of perjury. (*See generally* Def.'s Ex. C at 8–10.)  In accordance with Minn. Stat. § 609.523 subd. 4, Vetter agreed to "retain possession of the property for at least fourteen (14) days from this date and <u>SHALL</u> be willing to present the property upon request from either the prosecuting or defending authority in this matter should the need arise."  (Def.'s Ex. C. at 1 (emphasis in original).)

Armendariz indicates he was not notified in advance of the plan to release the money (*see generally* Pl.'s Resp. [ECF No. 103]), and complains that no forfeiture proceeding was initiated pursuant to Minn. Stat. §§ 609.531–5319.  (*See id.* at 7–8.) Rovney has not offered any evidence to the contrary; rather, he argued at the hearing that no such process was required prior to releasing the money to Vetter.

Armendariz subsequently learned the money had been released to Vetter and raised the issue through counsel at a contested omnibus hearing on August 12, 2015. (Def.'s Ex. F at 3 [ECF No. 89-1 at 32].)  Specifically, Armendariz's attorney argued the charges against Armendariz should be dismissed because the evidence—the bag and the money allegedly stolen from Vetter's truck—had been "disposed of" without notice, depriving Armendariz's counsel of the opportunity to review the serial numbers on the bills.  (*Id.*)  The parties also submitted written arguments to the court.  (Def.'s Exs. K, L [ECF No. 89-1 at 140–63].)  Armendariz's counsel argued the charge should be dismissed because the release of the money violated Armendariz's "right of due process of law, the right to confrontation and cross examination, and the right of compulsory process under Article I, sections six and seven of the Minnesota State Constitution . . .

due to the State's blatant violation of discovery rules." (Def.'s Ex. K at 6.) He argued that he was not able to inspect or examine the money, and that although the State had taken photographs, there was no record of the bills' serial numbers, they had not been examined for fingerprints, and no DNA testing was conducted. (*Id.* at 6–7.) Rovney countered that the decision to transfer the money to Vetter was proper because Vetter had supplied documentation supporting his claim to the money and because "[t]he retention of that large amount of money by the State would be devastating to a small business." (Def.'s Ex. L at 2.)

The Blue Earth County criminal court issued an order on September 9, 2015, denying, among other things, Armendariz's motion to dismiss the charges on the ground that the money and bag had been returned to Vetter. (Def.'s Ex. M at 1–2 [ECF No. 89-1 at 164].) Describing Armendariz's argument, the court stated, "Defendant argues that the State returned the property to the alleged victims and therefore failed to preserve potentially exculpatory material without notice to him," a claim the court understood to allege a violation of Armendariz's rights under *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.* at 11.) The court concluded the State's release of the money to Vetter did not deprive Armendariz of due process, however, because Armendariz had "failed to demonstrate that the released evidence had apparent material exculpatory value." (*Id.* at 11–12.) The court also rejected the argument that the bills' serial numbers should have been recorded, pointing out that Armendariz did not have the serial numbers for comparison so any such documentation would not have been useful. (*Id.* at 12–13.) In sum, the court concluded, "there was no evidence that the State failed to preserve

evidence it should have." (*Id.* at 13.)

### C. The Dismissal of the Criminal Charges Against Armendariz

The possession of stolen property charge against Armendariz was eventually dropped. On April 19, 2016, the State dismissed the complaint, saying it would be "concentrating on more serious charges against [Armendariz]." (Def.'s Ex. N [ECF No. 89-1 at 180].) Nothing in the record suggests that Armendariz was ever convicted of a crime based, directly or indirectly, on the alleged June 28, 2015, theft of money from Vetter.

### D. The Return of Some of Armendariz's Money and His Motion for the Return of the Rest

At some point after the charges against Armendariz were dismissed, Armendariz says $3,600 of the money seized incident to his arrest was returned to him. (Compl. ¶ L.) The remainder of the $19,636 in cash seized from him was never returned.[4]

In his response brief and at oral argument on the instant motion, Armendariz alluded to a "motion for a hearing," filed by his attorney in the criminal case, which sought the return of the rest of the money seized from him. He stated the court never ruled on the motion. (*See* Pl.'s Resp. at 9 [ECF No. 102].) At the Court's request, Armendariz submitted after the hearing a copy of the motion to which he referred. The motion is styled as a "Request for Order Re: Defendant's Property," and indicates that it

---

[4] The Court notes that the $15,075 given to Vetter and the $3,600 given back to Armendariz do not add up to the $19,636 originally seized. While the record does not explain this discrepancy, Armendariz only seeks the return of the money provided to Vetter. (*See* Compl. at 13 ("So remaining $15,705.00 should be returned.")

is a "Request for Order Without Hearing" (hereafter "Request for Order"). (Pl.'s Suppl. Resp. Ex. 1 at 1 [ECF No. 117].)  It includes as an exhibit the property receipt of the money seized from Armendariz at the time of his arrest (*id.* at 3), and is accompanied by a proposed order that the entirety of the $19,636 seized from Armendariz by law enforcement incident to his arrest be returned to him (*id.* at 2).  The Request for Order submitted by Armendariz does not bear a date, but on the proposed order appended to it the words "Dated this ___th day of August 2016" appear to the left of the blank for the judge's signature. (*Id.*)

After Armendariz submitted a copy of the Request for Order to this Court, Rovney filed a copy of a May 17, 2016 letter from Armendariz's attorney to the Blue Earth County District Court. (ECF No. 120 at 3–4.)  In it, Armendariz's attorney requests that "any and all [of] the money found on his person" be returned to him, although he acknowledges that the "State took a different view regarding Mr. Armendariz's claim to the money," and that "the bulk of the money was released to another claimant over Mr. Armendariz's objection."  (*Id.* at 3.)  The letter asks that if the "State is willing to return the money to Mr. Armendariz without further action, please do so promptly.  If not, Mr. Armendariz understands that he may have to bring a civil action to recover any sums that have been wrongly taken," including "any sums that have been previously released to the other claimant(s)."  (*Id.*)  The letter concludes by asking that "any money or other property belonging to him that was taken into evidence as part of the investigation in this matter be released to Mr. Armendariz or his designee." (*Id.* at 4.)

The Court has also reviewed the docket in the underlying criminal matter, *State of Minn. v. Joshua Raymond Armendariz*, 07-CR-15-2623 (Blue Earth Cty. Dist. Ct.).[5]   The Request for Order is identified on the docket as a "Proposed Order or Document" and was filed on August 8, 2016 (thus post-dating the May 17, 2016 letter).  (*Id.*)  The next entry on the docket, dated September 6, 2016 and identified as "Correspondence," is a handwritten letter from Armendariz to the court that again seeks return of the money. (*Id.*)  A week later, on September 13, 2016, the court filed its own "Correspondence" to counsel enclosing Armendariz's letter and asking the attorneys, including Rovney, to "forward to me your comments regarding the issues noted in this letter."  (*Id.*)  There is no further activity on the docket regarding this issue, suggesting that, as Armendariz stated, there was never a hearing or a ruling on his request.

## III.   DISCUSSION

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it might affect the outcome of the case under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" if the evidence could support a jury verdict in the non-moving party's favor.  *Id.*  The Court views the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving

---

[5] This information was accessed via the Minnesota Judicial Branch's Minnesota Court Records Online (MCRO) system, available at https://publicaccess.courts.state.mn.us/DocumentSearch.

party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The party

opposing a properly supported motion for summary judgment may not rest on mere

allegations or denials, but must cite to particular facts in the record showing there is a

genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1)(A); *Anderson*, 477 U.S. at 256.

Rovney advances several arguments in support of his motion for summary

judgment.  First, he argues that he is immune from suit, under both the doctrines of

prosecutorial immunity and qualified immunity.  Second, he argues that Armendariz's

claim was adjudicated by the state court and, consequently, either this Court lacks

jurisdiction under the *Rooker-Feldman* doctrine or the claim is barred by issue

preclusion.  Third, Rovney argues that Armendariz's claim must be rejected because

Armendariz failed to exhaust available and adequate state court remedies.  Fourth, he

contends that Armendariz cannot establish that he was denied procedural due process

because he cannot show he had a protected property interest in the money, and even if he

could, he was not denied notice and an opportunity to be heard.  Because the Court finds

it more useful to address the arguments in a different order, it will turn first to Rovney's

*Rooker-Feldman* and issue preclusion arguments.

### A.     Whether Rovney is Entitled to Summary Judgment Because Armendariz's Claim Has Already Been Adjudicated in State Court

Rovney argues Armendariz's claim was addressed in the state criminal

proceedings and cannot be re-litigated here.  Rovney relies on two doctrines, *Rooker-*

*Feldman* and issue preclusion.

### 1.    The *Rooker-Feldman* Doctrine

The *Rooker-Feldman* doctrine provides that federal district courts lack jurisdiction to consider "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). However "*Rooker-Feldman* does not 'stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court,' because 'if a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party …, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *Edwards v. City of* Jonesboro, 645 F.3d 1014, 1018 (8th Cir. 2011) (quoting *Exxon Mobil Corp.*, 544 U.S. at 293) (cleaned up). On the other hand, "once a party has litigated in state court . . . he cannot circumvent *Rooker-Feldman* by recasting his or her lawsuit as a section 1983 action." *Robins v. Ritchie*, 631 F.3d 919, 925 (8th Cir. 2011) (cleaned up). To decide if *Rooker-Feldman* applies, courts must "determine if the state and federal claims are inextricably intertwined." *Id.* "Federal claims are inextricably intertwined with state-court claims if the federal claims can succeed only to the extent the state court wrongly decided the issues before it." *Id.*; *see also Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 25 (1987) (Marshall, J., concurring)).

Rovney argues Armendariz's claim invites re-litigation of an issue already decided by the state district court, which specifically held that Armendariz's "due process rights

were not violated by the return of the property." (Def.'s Ex. M at 11.)   Because, Rovney

contends, the state court has already made a determination as to the very issue

Armendariz is attempting to litigate here, this Court lacks subject matter jurisdiction to

hear this claim.

But Rovney misapprehends the nature of *Rooker-Feldman*.   The doctrine is not

simply another form of collateral estoppel or issue preclusion.   It is a narrow doctrine

providing that someone who claims to have been injured by a wrongly-decided state

court judgment cannot come to federal court to challenge that judgment, directly or

indirectly.   *See Riehm v. Engelking*, 538 F.3d 952, 964–65 (8th Cir. 2008) (quoting *Lance

v. Dennis,* 546 U.S. 459, 464 (2006) and *Exxon Mobil Corp.,* 544 U.S. at 284).   Thus, for

the doctrine to apply, the alleged injury must be caused by a state court *judgment*.[6]   In

this case, there was no state court judgment, of any kind, that disposed of a claim

"inextricably intertwined" with Armendariz's claim here.   If the criminal complaint

---

[6] Rovney cites *Minch Fam. LLLP v. Buffalo-Red River Watershed Dist.*, 628 F.3d 960, 965 (8th Cir. 2010) and *Strickland v. Cty. Council of Beaufort Cty.*, 230 F. Supp. 3d 949, 952 (D. Minn. 2017) (which cites *Minch*) because both, at times, use the term "orders," rather than "judgments," to describe the application of the *Rooker-Feldman* doctrine. But both cases clearly applied the doctrine to final judgments.   In *Minch*, the Eighth Circuit considered a decision by the Minnesota Court of Appeals to authorize a Watershed District to remove accumulated silt from the ditch of a farmer's land.   628 F.3d at 965.   The court concluded *Rooker-Feldman* did not apply for other reasons; there is no indication that anyone thought the state appellate court's decision was less than a final judgment.   *Id.*   In *Strickland*, the district court found that the filing of an Income Withholding Notice by the state court clerk's office "lack[ed] the authority of an order" and therefore did "not constitute [a] state-court judgment[] for the purposes of the *Rooker-Feldman* doctrine."   230 F. Supp. 3d at 953.   Neither case stands for the proposition that a court's ruling on a pre-trial motion triggers *Rooker-Feldman* protection.

against Armendariz had led to a conviction on the charge of receipt of stolen property, Rovney might have an argument. But the criminal charges were dismissed, and therefore there was never an adjudication about whether Armendariz was in possession of any stolen property at all when he was arrested that night—let alone whether $15,705 of the cash found in his pocket was his or Vetter's. Accordingly, the *Rooker-Feldman* doctrine does not deprive this Court of jurisdiction over Armendariz's claim.

### 2.  Issue Preclusion

Rovney also contends that Armendariz's claim is barred by the doctrine of issue preclusion. "It is well established that prior criminal proceedings can work an estoppel in a subsequent civil proceeding, so long as the question involved was distinctly put in issue and directly determined in the criminal action." *S.E.C. v. Gruenberg*, 989 F.2d 977, 978 (8th Cir. 1993). In the Eighth Circuit, issue preclusion has five elements, one of which is that "the issue sought to be precluded must be the same as the issue involved in the prior action." *Robinette v. Jones*, 476 F.3d 585, 589 (8th Cir. 2007).

The Court begins by considering the specific nature of the claims Armendariz presented to the state court. (Def.'s Ex. K.) Armendariz did argue to the state court that the money was rightfully his. (*E.g.*, *id.* at 1 ("The Defendant has always maintained that the money found on his person belonged to him."); 13 ("This ignores Mr. Armendariz's claim to the money.").) He also invoked due process as a basis for his state court motion to dismiss. (*E.g.*, *id.* at 6 ("Dismissal of the charge is required in the present case because the right of due process of law . . . [was] violated due to the State's blatant violation of discovery rules."); 11 ("[T]he State's failure to provide notice deprived Mr. Armendariz

14

of evidence to defend himself, failed to ensure the integrity of our criminal justice system, and violated state and federal due process and Minnesota discovery rules.").) And he argued generally that it was "improper" to release the money without notice to Armendariz (*id.* at 13) and contrary to the State's customary practice (*id.* at 9).

But the real thrust of Armendariz's argument in the state court, and the remedy he sought, was quite different from the claim he is asserting here.[7]  Armendariz's argument to the state court handling his criminal case was that the disposition of the money violated due process *because it violated the rules of discovery*.  (*E.g.*, *id.* at 6 ("Dismissal of the charge is required in the present case because the right of due process of law . . . [was] violated due to the State's blatant violation of discovery rules."); 15 ("[T]he charge should be dismissed in order to correct the injustice that has failed to allow Mr. Armendariz alternative methods to present a complete defense or properly examine, confront, and dispute the evidence and/or allegations against him.").  Armendariz repeatedly argued that the money's release violated his due process rights because it limited his access to potentially exculpatory evidence, and specifically because it prevented him from being able to inspect the money, note its serial numbers, or test it for fingerprints or DNA.  (*See id.* at 6, 7, 10, 11.)  In other words, the due process right

---

[7] Parts of Armendariz's responsive memorandum on this motion also raise discovery concerns.  (*See, e.g.*, Pl.'s Resp. at 1–3.)  But the only surviving claim in this case, and the one on which Rovney now seeks summary judgment, is that Rovney "unlawfully deprived Armendariz of property without due process."  (*See* May 18, 2020 Ord. Adopt. R&R.)

Armendariz was making related to the loss or destruction of exculpatory evidence, *not* the disposition of his own property.

But of even more importance is that the Blue Earth County criminal court did not *decide* whether Armendariz owned the money or whether the decision to release the money to Vetter deprived Armendariz of property without due process. The only issue decided by the Blue Earth County court was whether the criminal charges against Armendariz should be dismissed because, in releasing the money and the money bag to Vetter, Rovney had mishandled *the evidence represented by the money and the bag*, thereby depriving Armendariz of potentially exculpatory evidence (such as fingerprints or DNA) in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In the section headed "Defendant's Due Process Rights Were Not Violated by the Return of the Property," the court was clear that the 'due process rights' at issue related to Armendariz's allegation that the State "failed to preserve potentially exculpatory material without notice to him," and that in so doing, the State "committed a '*Brady* violation' by failing to provide a defendant with all evidence it has that is material to Defendant's guilt or to the resultant punishment." (Def.'s Ex. M at 11.) The opinion discussed an alleged "due-process violation where the state loses, destroys, or otherwise fails to preserve evidence. . . ." (*Id.* at 12.) In fact, the court never addressed at all Armendariz's claim that the money released to Vetter actually belonged to Armendariz. The opinion concluded that "[s]ince Defendant is unable to show a *Brady* violation, the release of the property does not constitute grounds for dismissing the charges against Defendant." (*Id.* at 13.)

16

Consequently, the state court did not consider, let alone decide, the claim that Armendariz presents here. While Rovney is correct that the state court ruled on a due process challenge that arose out of the release of the money to Vetter, it was not the same due process challenge raised by Armendariz's claim before this Court. Therefore, the doctrine of issue preclusion does not bar Armendariz's claim.

**B.      Whether Rovney is Entitled to Summary Judgment Because Armendariz Cannot Show He Was Deprived of Property Without Procedural Due Process**

Rovney contends that even if the Blue Earth County District Court did not dispose of Armendariz claim, Rovney is entitled to summary judgment because Armendariz has not adduced sufficient evidence to create a genuine issue of material fact as to either of the elements of a procedural due process claim. When assessing a procedural due process claim, courts engage in a two-step analysis "asking, first, whether the plaintiffs have a protected interest at stake, and if so, what process is due." *Bliek v. Palmer*, 102 F.3d 1472, 1475 (8th Cir. 1997).

### 1.      Protected Property Interest

In order to meet the first prong—a "protected property interest"—Armendariz must have a "legitimate claim of entitlement" to the property. *Hopkins v. Saunders*, 199 F.3d 968, 975 (8th Cir. 1999); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (finding that property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law"). Rovney argues Armendariz is unable to prove the money found in his pocket

17

was his, and therefore cannot show he had a protected property interest, thus warranting summary judgment in Rovney's favor.

But Rovney's argument attempts to shift to Armendariz the burden of proving at the summary judgment stage that the money did *not* belong to Vetter. That attempt suffers from two key fallacies. First, Armendariz did not move for summary judgment; Rovney did. Thus, Armendariz does not have to prove beyond dispute that the money was his; he can survive summary judgment on this issue so long as there is sufficient evidence upon which a reasonable fact finder could conclude he had a protected property interest in the money. Although he needs more than mere allegations to overcome evidence in the record, the burden remains with Rovney.

Second, there *is* evidence of record that creates a genuine dispute as to Armendariz's interest in the money. To begin, the money was indisputably in Armendariz's possession when it was seized, and under Minnesota law, possession creates a property interest—albeit lesser than an ownership interest. *See Fed. Nat'l Mortg. Ass'n v. LeMaster*, Case No. A16-1962, 2017 WL 2920288, at *3 (Minn. Ct. App. July 10, 2017) ("Because eviction from the property deprives LeMaster of possession of property, which is a property interest, we must determine whether the process provided was sufficient."); *Swenson v. Holsten*, 783 N.W.2d 580, 585 (Minn. Ct. App. 2010) ("One who can demonstrate that he or she lawfully took possession of the carcass of an animal that died naturally may establish a property interest in the carcass."); *Hefner v. Est. of Ingvoldson*, 346 N.W.2d 204, 206 (Minn. Ct. App. 1984) ("Courts look at possession and contributions toward purchase in determining the respective property

interests of co-owners of federal savings bonds."); *see also United States v. 1982 Sanger 24' Spectra Boat*, 738 F.2d 1043, 1046 (9th Cir. 1984) ("It is not necessary therefore that a claimant under the forfeiture statute allege ownership.  A lesser property interest such as possession creates standing.").

Moreover, Armendariz has stated under oath that the money was his.  (*See* Def.'s Ex. F at 75:19 – 79:10 [ECF No. 89-1 at 104-07].)  While a motion for summary judgment cannot be opposed successfully on the basis of "mere allegations or denials," a statement made under penalty of perjury by someone who purports to have personal knowledge of a material fact is admissible evidence, and Armendariz has sworn that the money was his.  Nor is there irrefutable evidence before this Court that the money seized from Armendariz actually belonged to Vetter.  Rovney complains that when asked in discovery, Armendariz produced no documentation to corroborate his claim of ownership.[8]  (Def.'s Mem. Supp. Summ. J. at 19–20.) That may go to his chances of succeeding ultimately at trial, but it does not mean there is no genuine issue of material fact concerning whether Armendariz has a "legitimate claim of entitlement" to the seized money in this case.  Thus, viewing the facts and evidence in the light most favorable to Armendariz, the nonmoving party, the Court cannot conclude that Rovney is entitled to summary judgment on this basis.

---

[8] The Court notes that at no time did Rovney move to compel further responses to his interrogatories or requests for production of documents.

### 2.    Denial of Procedural Due Process

In *Mathews v. Eldridge*, the Supreme Court outlined the three factors that a court

must consider in determining what process is owed in order for a state to deprive an

individual of his or her private property without violating the Fourteenth Amendment:

> First, the private interest that will be affected by the official action; second,
> the risk of an erroneous deprivation of such interest through the procedures
> used, and the probable value, if any, of additional or substitute procedural
> safeguards; and finally, the Government's interest, including the function
> involved and the fiscal and administrative burdens that the additional or
> substitute procedural requirement would entail.

424 U.S. 319, 335 (1976). "Applying this test, the [Supreme] Court usually has held that

the Constitution requires some kind of a hearing *before* the State deprives a person of

liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). The Eighth Circuit

has interpreted this precedent to mean that procedural due process entitles a person to

"predeprivation notice and hearing" where "deprivations of property are authorized by an

established state procedure." *Keating v. Nebraska Pub. Power Dist.*, 562 F.3d 923, 928

(8th Cir. 2009); *see also Foster v. Missouri Dep't of Health & Sr. Servs.*, 736 F.3d 759,

763 (8th Cir. 2013); *Walters v. Wolf*, 660 F.3d 307, 313 (8th Cir. 2011). Here, Rovney

claims to have acted under an established state procedure, specifically, Minn. Stat.

§ 609.523, subd. 3.

Courts have found exceptions to the general rule requiring predeprivation notice

and hearing when there is a need for quick action by the state based on a compelling state

interest or where the deprivation results from a random and unauthorized act by a state

actor, *see Keating*, 562 F.3d at 928. But Rovney does not claim his actions were

20

"random and unauthorized," and has not offered evidence showing as a matter of law a compelling state interest that required return of the money to Vetter so quickly that predeprivation process would have been impossible, or even impractical.[9]   Rovney makes only a perfunctory argument that "even if Armendariz could establish a protected property interest, he cannot show that he was denied due process of law," stating merely that due process "involves notice and an opportunity to be heard" and that Armendariz "had notice that the cash was being seized during his arrest."  (*Id.* at 20.)  The argument misses the point entirely.  Armendariz does not claim his due process rights were violated when the police seized the money when they arrested Armendariz; rather he claims that the violation occurred when, without notice to him, money he consistently claimed was his was given to Vetter.  Nowhere does Rovney offer a fully-developed argument informed by Eighth Circuit precedent in support of the proposition that Armendariz was not entitled to notice and an opportunity to be heard *before* Rovney authorized Tagatz to release the money to Vetter.

Accordingly, Rovney has not demonstrated that he is entitled to summary judgment on the ground that Armendariz's right to due process did not require predeprivation notice and an opportunity to be heard before the money was released to Vetter.

---

[9] The only exigency Rovney has identified was the "economic hardship it would cause Vetter" if the money was not transferred to him.  (Def.'s Mem. Supp. Summ. J. at 11.)  But Rovney has offered neither evidence nor legal authority that would support a conclusion as a matter of law that the economic hardship to Vetter was an exigency that would preclude a reasonable predeprivation process.  *Walters*, 660 F.3d at 314.

### 3.     Failure to Exhaust Postdeprivation Remedies

Rovney argues, however, that Armendariz cannot pursue an action under § 1983 for deprivation of his money without procedural due process because he failed to exhaust adequate *postdeprivation* remedies that were available to him under state law.  The Eighth Circuit has said that "'[i]n challenging a property deprivation [under the Fourth Amendment or the Due Process Clause], the claimant must either avail himself of the remedies guaranteed by state law or prove that the available remedies are inadequate.'" *Ali v. Ramsdell*, 423 F.3d 810, 814 (8th Cir. 2005) (quoting *Hudson v. Palmer*, 468 U.S. 517, 539 (1984) (O'Connor, J., concurring)).  "[A] litigant asserting a deprivation of procedural due process must exhaust state remedies before such an allegation states a claim under § 1983."  *Raymond v. Bd. of Regents of the Univ. of Minn.*, 847 F.3d 585, 589 (8th Cir. 2017).  Rovney argues that Plaintiff's failure to exhaust several available state remedies is fatal to his claim.

### a.     Minnesota Statutes Section 626.04

Minnesota state law requires that seized property "be safely kept by direction of the court as long as necessary for the purpose of being produced as evidence on any trial."  Minn. Stat. § 626.04(a).  It also describes the process by which the owner of seized property can request its return:

> If the owner of the property makes a written request to the seizing officer's agency for return of the property, and the property has not been returned within 48 hours of the request, excluding Saturday, Sunday, or legal holidays, the person whose property has been seized may file a petition for the return of the property in the district court in the district in which the property was seized.

22

*Id.* Upon receiving the petition, the court schedules a "simple and informal" hearing where the court may receive "evidence on any issue of fact necessary to the decision on the petition." *Id.* After the hearing, the court will issue an order detailing its findings, although the court must not return the property if it finds that:

> (1) the property is being held in good faith as potential evidence in any matter, charged or uncharged;
> (2) the property may be subject to forfeiture proceedings;
> (3) the property is contraband or may contain contraband; or
> (4) the property is subject to other lawful retention.

*Id.* Rovney argues this is the process Armendariz should have followed to assert his claim to the money, and his failure to do so bars his current claim.

But § 626.04 would not have helped Armendariz here. On its face, the statute applies when property is being *retained* by the seizing authority as evidence while a criminal investigation and proceedings are ongoing. But here, Rovney made the decision to *not retain* the money as evidence, and instead released it to someone else before the criminal proceedings had concluded, and without giving Armendariz notice and an opportunity to oppose that action.[10] By the time he was alerted to the decision, Armendariz could not have invoked § 626.04(a) to get the money back, since it was no longer in the possession of the government.

---

[10] It is also not clear that the procedures in § 626.04(a) are designed for adjudication of disputes regarding the rightful owner of the seized property in any event; it seems to contemplate only a determination of whether the government should retain possession of property that is potential evidence for the duration of the criminal proceedings. *See* Minn. Stat. § 626.04(b) ("After the trial . . . the property or thing shall . . . be returned . . . .")

b.      Replevin

Rovney next argues Armendariz should have exhausted his right of replevin under

Minnesota Statutes § 548.04.  In Minnesota, replevin "is an appropriate form of action in

which to determine which of two contending parties is the owner" of a piece of property.

*Widgren v. Massie*, 352 N.W.2d 420, 425 (Minn. Ct. App. 1984) (citing *Seebold v.*

*Eustermann*, 13 N.W.2d 739, 745 (Minn. 1944)).  However, replevin is a postdeprivation

remedy.  *See Walters*, 660 F.3d at 309.  The Eighth Circuit held in *Keating* that "it is not

necessary for a litigant to have exhausted available *postdeprivation* remedies when the

litigant contends that he was entitled to *predeprivation* process."  562 F.3d at 929

(emphasis in original).

In *Walters*, the Eighth Circuit evaluated a situation analogous to the one at issue

here.  In that case, the plaintiff was arrested on an outstanding warrant and at the time of

his arrest disclosed that he had a loaded pistol in his car's center console.  660 F.3d at

309.  The officer seized the gun.  *Id.*  The plaintiff was charged with a felony of unlawful

possession of a concealable firearm, but that charge was dismissed for lack of probable

cause.  *Id.* at 310.  After the plaintiff sent a series of written requests for the return of the

gun, he received a response from the chief of police that under department policy, the

plaintiff would need to obtain a writ of replevin to have the gun returned to him.  *Id.*

Soon after, the plaintiff filed a § 1983 action against the chief and the city alleging,

among other things, a violation of procedural due process.  *Id.*  The parties filed cross-

motions for summary judgment and the district court granted the defendants' motion in

part on the grounds that the plaintiff's failure to pursue a replevin action was fatal to his

due process claim. *Id.* at 310–11.

The plaintiff appealed that ruling and the Eighth Circuit reversed. The court began

its analysis by pointing out that usually "the Constitution requires some kind of a hearing

*before* the State deprives a person of liberty or property," although in circumstances

involving a "random and unauthorized" act by a state official a postdeprivation action,

such as replevin, is sufficient. *Id.* at 312 (quoting *Zinermon*, 494 U.S. at 127) (emphasis

in original). The court went on to note that the police had withheld the weapon pursuant

to "an established state procedure," so a postdeprivation hearing was insufficient. *Id.* at

313; *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) ("In any event,

the Court's decisions suggest that, absent the necessity of quick action by the State or the

impracticality of providing any predeprivation process, a postdeprivation hearing here

would be constitutionally inadequate."); *Coleman v. Watt*, 40 F.3d 255, 262 (8th Cir.

1994) ("[T]he availability of state law postdeprivation remedies bears relevance *only*

where the challenged acts of state officials can be characterized as random and

unauthorized.") (emphasis in original). The court then found that the case involved *two*

deprivations: the first when police seized the plaintiff's handgun incident to arrest and the

second when the State refused to surrender the gun following the dismissal of the

weapon-related charge. *Walters*, 660 F.3d at 314. It concluded the first deprivation was

valid and supported by probable cause, such that the plaintiff was not entitled to

predeprivation process. *Id.* However, the second deprivation, when the police refused to

return the plaintiff's property, was without legal grounds and "had no attendant

exigencies." *Id.*  The court concluded that as to the second deprivation, "post-hoc state tort action"—the writ of replevin—was "inherently insufficient." *Id.* at 315.

In *Walters,* the Eighth Circuit relied heavily on its prior decision in *Lathon v. City of St. Louis*, 242 F.3d 841 (8th Cir. 2001).  In *Lathon*, the St. Louis Police Department seized firearms and ammunition, which it refused to return to Lathon even though it never filed charges against him.  *Id.* at 842.  Instead, the police department gave the weapons to the sheriffs' offices of three different Missouri counties.  *Id.*  Lathon sued under § 1983, but the district court granted summary judgment on the ground that Lathon received sufficient predeprivation process through the warrant procedure.  *Id.* at 843.  The Eighth Circuit reversed, emphasizing that the "pivotal deprivation in this case was not the initial seizure of the ammunition and weapons, but the refusal to return them without a court order after it was determined that these items were not contraband or required as evidence in a court proceeding."  *Id.*  The court concluded that the decision not to return the property was "not the sort of action for which postdeprivation process will suffice." *Id.*

In Armendariz's case, as in *Walters* and *Lathon,* there were two deprivations.  The first, when the money was initially seized incident to his arrest, is not at issue here.  The second deprivation occurred when Rovney transferred to Vetter $15,705 of the more than $19,000 seized from Armendariz and returned to Armendariz only $3,600.   And, as in *Walters* and *Lathon,* the transfer of the money to Vetter was not random or ad hoc but conducted pursuant to an established procedure.

26

In support of his argument that Armendariz's claim should be rejected because he failed to avail himself of postdeprivation state law remedies, Rovney relies on *Berget v. City of Eagan,* Case No. 08-cv-4728 (MJD/FLN), 2010 WL 11602636 at *2 (D. Minn. Mar. 23, 2010), *aff'd*, 389 F. App'x 588 (8th Cir. 2010).  In that case, police executed a search warrant at the home of a person suspected of stealing property from a business.  In the course of the search, officers confiscated hundreds of items they believed to be stolen, and damaged additional items.  *Id.*  The suspect's mother demanded the return of certain property, and those items that were "specifically claimed by her and clearly belonging to her were returned."  *Id.* at *3.  She subsequently wrote a letter identifying additional property that belonged to her family, but the remaining items were sold at auction.  *Id.* The family sued the city under 42 U.S.C. § 1983 for depriving them of their property without due process but the district court granted summary judgment to the city, finding that the plaintiffs failed to avail themselves of various state law remedies and "neither argued nor presented any evidence to suggest that these state law remedies were inadequate."  *Id.* at *7.  The Eighth Circuit summarily affirmed the district court on appeal pursuant to Eighth Circuit Rule 47B.  *Berget v. City of Eagan*, 389 F. App'x 588 (8th Cir. 2010).

But a year later, the Eighth Circuit handed down its precedential opinion in *Walters*, reaffirming unequivocally that the availability of state law postdeprivation remedies is relevant only where the state officials' actions were random and unauthorized.  660 F.3d at 314.  Accordingly, the Court does not find *Berget* persuasive here.  In view of *Walters* and *Lathon,* the Court concludes Rovney's decision to refuse to

27

return the money to Armendariz and instead transfer it to Vetter "is not the sort of action for which postdeprivation process will suffice." *Lathon*, 242 F.3d at 844. Thus, Armendariz's failure to seek a writ of replevin does not bar his § 1983 claim.

### c.      Conversion

Rovney likewise argues Armendariz could have pursued a claim for conversion under Minnesota state law. Under Minnesota law, conversion is "an act of willful interference with personal property, done without lawful justification by which any person entitled thereto is deprived of use and possession." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997) (internal quotation marks omitted). "A claim for conversion requires two elements: (1) that plaintiff has a property interest in some property; and (2) that defendant deprives the plaintiff owner of that interest." *Cobb v. PayLease LLC*, 34 F. Supp. 3d 976, 988 (D. Minn. 2014) (citing *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 838 (Minn. Ct. App. 1994)). But conversion, like replevin, is a postdeprivation remedy. Thus, for the reasons stated above, Armendariz's failure to pursue a conversion action is not a bar to this claim.

The Court therefore concludes that Rovney is not entitled to summary judgment in his favor on the ground that Armendariz was not entitled to procedural due process, or on the ground that Armendariz failed to pursue available postdeprivation remedies.

### C.      Whether Rovney Is Immune from Suit

#### 1.      Prosecutorial Immunity

Rovney contends his decision to release the cash to Gerald Vetter falls within the scope of his prosecutorial duties and that he is therefore absolutely immune from any suit

challenging that action.  Prosecutors are absolutely immune from suit for acts within the scope of their duties of initiating and pursuing prosecution.  *Imbler v. Pachtman*, 424 U.S. 409, 427, 431 (1976).  "The doctrine of judicial immunity provides that a prosecutor is absolutely immune from civil liability when a prosecutor acts within the scope of his duties by filing and maintaining criminal charges."  *Willis v. Tarasen*, Case No. 04-cv-4110 (JMR/FLN), 2005 WL 1270729, at *5 (D. Minn. May 6, 2005), *report and recommendation adopted*, 2005 WL 1514135 (June 27, 2005).  This immunity extends to "actions preliminary to the initiation of a prosecution and actions apart from the courtroom" but not to "administrative duties and those investigatory functions that do not relate to . . . the initiation of a prosecution or for judicial proceedings."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 272–73 (1993).  In determining whether absolute immunity is available for particular actions, courts engage in a "functional" analysis of each alleged activity.  *See id.* at 269.

Generally, decisions regarding the handling of evidence are within the scope of a prosecutor's duties and are therefore covered by prosecutorial immunity.  *See Rodgers v. Knight*, 781 F.3d 932, 945 (8th Cir. 2015) (retention of evidence for prosecution and for the potential refiling of charges is covered under prosecutorial immunity); *Thompson v. Walbran*, 990 F.2d 403, 404 (8th Cir. 1993) ("We also conclude that Walbran is entitled to absolute prosecutorial immunity for retaining Thompson's property because it was important evidence and, if Thompson succeeded on direct appeal or his section 2255 petition, it would be needed at trial.").  However, courts have distinguished between management of evidence and the disposition of seized property, considering the latter to

29

be an administrative aspect of a prosecutor's role.  *See Schrob v. Catterson*, 948 F.2d 1402, 1419 (3d Cir. 1991) (holding that the retention and management of property obtained under the forfeiture statutes is an administrative duty, not covered by prosecutorial immunity); *Coleman v. Turpen*, 697 F.2d 1341, 1346 (10th Cir. 1982) (finding that prosecutor was acting as an administrator, not an advocate, in "managing the post-trial disposition of seized property not used as evidence that the State did not intend to keep—as evidenced by its acquiescence in the sale"); *Herrin v. Dunham*, Case No. 05-CV-10245, 2008 WL 2781456, at *7 (E.D. Mich. Mar. 17, 2008) (recommending finding that when prosecutor improperly refused to return property where no charges were brought and no forfeiture action was taken, he was acting in an administrative function and was not entitled to absolute immunity), *adopted in part by* 2008 WL 2718802 (July 10, 2008) (granting summary judgment on statute of limitations grounds and declining to consider other aspects, including immunity).

Here, certain aspects of Rovney's handling of the cash and bank bag may well have been related to the "initiation of a prosecution," even—perhaps—his decision that those articles did not need to be retained by his office for evidentiary purposes.  But Rovney's decision to release the cash to Vetter a mere one week after Armendariz was charged was not done in furtherance of the criminal prosecution.  On the contrary, Rovney has repeatedly referenced administrative or ministerial considerations in defending his decision to release the money, such as the fact that Vetter had documentation of the amount of money that should have been in his bank bag and Rovney's concerns that "[t]he retention of that large amount of money by the State would

be devastating to a small business." (Def.'s Ex. L at 2; *see also* Def.'s Ex. F at 45:16–22

[ECF No. 89-1 at 74], Def.'s Mem. Supp. Summ. J. at 11.)  Regardless of the validity of

the considerations underlying Rovney's decision about the appropriate destination for the

released funds, those considerations were unrelated to his role as an advocate or to the

efficient or effective prosecution of his case.  Accordingly, the Court concludes that

prosecutorial immunity is not applicable here.

### 2.    Qualified Immunity

In the alternative, Rovney argues his decision to release the money to Vetter was

an exercise of a discretionary function and he was therefore entitled at least to qualified

immunity.  Rovney contends his decision to release the money to Vetter was authorized

by Minnesota Statute § 609.523, subd. 3, which provides:

> A law enforcement agency which is holding property over which a person is
> alleged to have exerted unauthorized control or to have otherwise obtained
> unlawfully may return that property to its owner if:
>> (1) the appropriately identified photographs are filed and retained by
>> the law enforcement agency;
>> (2) satisfactory proof of ownership of the property is shown by the
>> owner;
>> (3) a declaration of ownership is signed under penalty of perjury; and
>> (4) a receipt for the property is obtained from the owner upon delivery
>> by the law enforcement agency.

Rovney points to evidence that each of the four requirements was met: The money was

photographed and the photographs were retained by law enforcement.  (Def.'s Ex. C at 9-

10.)  The empty money bag found in the trunk was printed with the name of Vetter's

business, and Vetter submitted sales receipts totaling $15,705.  (*See generally id.*)  Vetter

signed a sworn declaration of ownership and provided a receipt to law enforcement for

the funds.  (*Id.* at 8.)  Rovney argues his decision to release the property to Vetter in reliance on this statute was reasonable, given the circumstances surrounding the discovery of the money, the proof offered by Vetter that the money was his, and the economic hardship Vetter would face if the money was not returned promptly.

Qualified immunity protects government officials who perform discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The Court agrees with Rovney that his decision to release the cash to Vetter was the exercise of a discretionary function for which qualified immunity is available.  Therefore, the Court must consider "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Winslow v. Smith*, 696 F.3d 716, 730–31 (8th Cir. 2012) (internal quotations omitted).

The Court has already concluded that Rovney is not entitled to summary judgment on the first element, i.e., whether the release of the money to Vetter without a prior opportunity for Armendariz to be heard was a violation of his right to procedural due process.  The Court thus turns to whether Rovney is entitled to summary judgment on the ground that it was not clearly established that his release of the money in reliance on Minn. Stat. § 609.523 would violate Armendariz's right to due process.  For the right to have been clearly established at the time of the alleged violation, "[t]he precedent must be clear enough that every reasonable official" would understand the action was unlawful.  *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018).  "There is no

requirement that the very action in question has previously been held unlawful," but "the unlawfulness must be apparent" when the action is considered "in the light of pre-existing law." *Vaughn v. Ruoff*, 253 F.3d 1124, 1129 (8th Cir. 2001) (internal quotations omitted).

The Eighth Circuit has held that "reliance on a state statute that has not been declared unconstitutional is generally a paradigmatic example of reasonableness that entitles an officer to qualified immunity." *Ness v. City of Bloomington*, 11 F.4th 914, 921 (8th Cir. 2021) (citing cases). "When a legislative body establishes a law, the enactment 'forecloses speculation by [officers] concerning its constitutionality,' unless the law is 'so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws.'" *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979)). Here, Rovney released the money to Vetter in reliance on a procedure established by state statute. *Walters* notwithstanding, the Court cannot conclude that Minn. Stat. § 609.523 is "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." Similarly, while the Court has some concerns about whether the submission of sales receipts alone ought to have been considered "satisfactory proof of ownership" as to unmarked cash for which there were no serial numbers recorded, no other identification available, and competing claims of ownership, there is no evidence that Rovney was acting outside the discretion afforded by Minn. Stat. § 609.523 in deeming that proof "satisfactory." *See Anderson*, 477 U.S. at 248.

33

In sum, although the Court believes Minnesota's return-of-property procedure under Minn. Stat. § 609.523 is constitutionally suspect as-applied to Armendariz, the Court concludes Rovney's reliance on the statutory scheme here was not objectively unreasonable, and Rovney is therefore entitled to summary judgment on the ground of qualified immunity.[11]

## V.     Recommendation

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that Defendant Chris Rovney's Motion for Summary Judgment [ECF No. 86] be **GRANTED.**

Dated:  October 12, 2021

*s/ Hildy Bowbeer* _____
HILDY BOWBEER
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

---

[11] It is possible Armendariz could have challenged the constitutionality of Minn. Stat § 609.523 as applied to his situation by means of an official capacity claim against Rovney, which would not have been susceptible to a qualified immunity defense.  But while his Complaint originally asserted an official capacity claim against Rovney arising out of the release of the money, it was dismissed without prejudice because he did not allege a basis for that claim under *Monell.*  (*See* Apr. 9, 2020 R&R at 5.) Armendariz never sought leave to file an amended complaint, and the deadline for doing so expired in August 2020. (*See* PSO at 2 [ECF No. 27], as amended [ECF No. 57].)